1
2
3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

4
5
6

CENTENNIAL BANK,

           Appellant,

      v.

EVANDER FRANK KANE,

           Appellee.

Case No. 23-cv-02944-WHO

**ORDER ON BANKRUPTCY APPEAL**

Re: Dkt. No. 1

United States District Court
Northern District of California

Centennial Bank ("Centennial") appeals the final order and judgment of the United States Bankruptcy Court for the Northern District of California, the Hon. Stephen L. Johnson, presiding, which denied Centennial's objection to appellee and debtor Evander Kane's discharge under 11 U.S.C. §§ 727(a)(3) and (a)(5). Centennial asserts four separate grounds for overturning the bankruptcy court. None prevails because the bankruptcy court committed no clear error when it determined that: (1) Kane's explanation for loss of cash assets was adequate; (2) his failure to maintain financial records did not make it impossible to ascertain his financial condition; (3) his failure to maintain financial records was justified; and (4) the proper "look-back" period, considering the facts at issue, ran from the time of Centennial's first loan to Kane. The bankruptcy court's decision is AFFIRMED.

## BACKGROUND

Evander Kane is a professional hockey player who now plays for the Edmonton Oilers. *See* Order Following Bankruptcy Court Trial ("Order") [Dkt. No. 9-1] 2-3; Appellant's Opening Brief ("Opening Br.") [Dkt. No. 8] 4; *see also* Opening Br. Appx. 4, CB_104 ln. 9-12. [1] At trial on the adversary proceeding, Kane testified that he has had a serious gambling problem, and

---

[1] The facts in this section are from the bankruptcy court's post-trial order, the documents upon which the court relied at trial, and testimony from the underlying trial.

described his gambling as "volatile."  Opening Br. Appx. 5 (Amended Trial Transcript ("Tr.") [Dkt. No. 9-5] (amended trial transcript of trial, day 2).  His bankruptcy schedules show that "in the year prior to filing a bankruptcy petition, he lost $1.5 million gambling at casinos and on sports betting."  *Id.* 3.

Kane testified that he had two principal means to gamble.  He used casinos extensively; the casinos lent him substantial sums of money in the form of "markers," which are a kind of casino credit.  *See* Tr. 53:8-10.  He also used "bookies" beginning in 2012.  *Id.* 71:3-5.  Bookies allowed him to bet on sports games online.  The limit that he could borrow from bookies varied, but increases were routine.  *Id.* 72:24-73:11. When he had to pay a bookie, which would generally happen when he had exhausted a line of credit, he would try to pay them in cash, a wire transfer, cashier's checks, bank drafts, or jewelry.  *Id.* 73:12-74:3, 74:7-12, 74:25-75:6.  If he could not pay the bookie, he would sometimes request an increase in his line of credit and try to win some of the money back.  *Id.* 74:11-17.  At trial, Kane testified that he used bookies extensively, sometimes betting on as many as 50 games at the same time. *Id.* 78:13-25.

Kane earned a substantial sum of money as a professional hockey player.  He earned $6 million (gross) in 2018, and $7 million in 2019 and 2020.  Order 5:7-18; Case. No. 21-50028 Dkt. No. 29.  But every year, at least 18% of his salary was escrowed to cover the team's losses during the season; often, only 2-3% of escrowed funds were returned to players at the end of a season, and at least once, nothing was refunded.  Order 5:10-15; Tr. 135:7-20, 135:23-25, 136:1-5.  Kane testified that taxes plus the escrow charge consumed 45% of his paychecks, and that his salary was further impacted by his agent's fee, the NHL lockout that occurred in 2012-13, and the COVID-19 pandemic.  Order 5:14-17 (citing trial transcripts).

Following years of gambling and borrowing money to finance prior loans, by 2014 and thereafter Kane always had substantial debts.  Order 2-3.  In September 2018, he obtained a loan from Centennial Bank for $3.9 million, the first of four loans.  *Id.* at 2-3, 28.  Over a period of eight months, Centennial loaned Kane a total of $8 million, at least 98% of which he used to pay down prior debts.  *Id.* at 2-3.  Each loan included a closing statement for one or more prior loans, informing Centennial that Kane would use the funds to pay down the prior loans.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In January 2021, three years after Centennial's first loan to him, Kane filed for relief under

2    Chapter 7 of the Bankruptcy Code.  Opening Br. 6; *see also* Opening Br. Appx. 6.  Centennial

3    then filed the underlying adversary proceeding, alleging that Kane should be denied a discharge

4    for two overarching reasons.  First, it argued under § 727(a)(5) of the Bankruptcy Code that he

5    should be denied discharge because of his "inability to satisfactorily explain the loss or deficiency

6    of certain cash assets."  *See* Opening Br. 8.  Second, it asserted under § 727(a)(3) that he should be

7    denied discharge because of his "admitted failure to keep or preserve adequate records to

8    accurately explain and document his present financial condition and to follow his transactions for

9    a reasonable period in the past."  *Id.*

10   The bankruptcy court held a two-day trial.  Judge Johnson ultimately ruled in Kane's

11   favor.  This appeal followed.

**LEGAL STANDARD**

13   District courts have jurisdiction to hear appeals from, inter alia, "final judgments, orders,

14   and decrees" of the bankruptcy courts.  28 U.S.C. § 158(a)(1); *see also* Fed. R. Bankr. Proc. 8005.

15   On appeal, "[t]he bankruptcy court's findings of fact are reviewed for clear error, while its

16   conclusions of law are reviewed de novo."  *In re Strand*, 375 F.3d 854, 857 (9th Cir. 2004).

17   Immensely case-specific factual issues require deference by the appellate court.  *U.S. Bank N.A. v.*

18   *The Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018).  "Mixed questions of law and fact are

19   [generally] reviewed de novo."  *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998).  However, the

20   Supreme Court recently clarified that when a mixed question is primarily factual, the standard of

21   review is usually clear error review.  *Lakeridge*, 583 U.S. at 396.

22   In reviewing the bankruptcy court's findings for clear error, "[t]his court must accept the

23   bankruptcy court's findings of fact unless, upon review, the court is left with the definite and firm

24   conviction that a mistake has been committed by the bankruptcy judge."  *In re Greene*, 583 F.3d

25   614, 618 (9th Cir. 2009).  "If two views of the evidence are possible, the [bankruptcy] judge's

26   choice between them cannot be clearly erroneous."  *In re Marshall*, 721 F.3d 1032, 1039 (9th Cir.

27   2013) (quoting *Price v. Lehtinen (In re Lehtinen)*, 332 B.R. 404, 411 (9th Cir. BAP 2005)).

28   "'[C]learly erroneous' is a very exacting standard . . . [t]o be clearly erroneous, a decision must

strike us as more than just maybe or probably wrong; it must be dead wrong." *Campion v. Old Republic Home Prot. Co*., No. 09-CV-748-JMA NLS, 2011 WL 1935967, at *1 (S.D. Cal. May 20, 2011) (quoting *Hopwood v. State of Texas*, 236 F.3d 256 (5th Cir. 2000)) (internal quotes omitted).  For factual inferences based on the evidence, "[a] court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record." *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (citing *United States v. Hinkson*, 585 F.3d 1247, 1261–62 & n. 21 (9th Cir. 2009) (en banc) and *Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985)).

## DISCUSSION

On appeal, Centennial argues that the bankruptcy court committed clear error meriting reversal when it denied Centennial's objections to Kane's bankruptcy discharge.  It argues that the court erred: (1) by finding that Kane adequately explained the loss of over $60 million in salary as a professional hockey player pursuant to § 727(a)(5); (2) by finding that although Kane failed to keep and preserve records as required by § 727(a)(3), it was still possible for creditors to ascertain his financial condition; (3) by finding that Kane showed adequate justification for failing to keep and preserve those records; and (4) by limiting its § 727(a)(3) analysis to the period after Centennial approved its first loan to Kane.  To find clear error on the bankruptcy court's factual determinations, I must be left with a definite and firm conviction that a mistake has been made. *See In re Greene*, 583 F.3d at 618.  I find no clear error, as explained below.[2]

## I.   SECTION 727(A)(5)

Section 727(a)(5) of the Bankruptcy Code provides that the court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  Whether a debtor has satisfactorily explained a loss of assets is a question of fact for the bankruptcy court, overturned only for clear error.  *In re Thompson*, 2009 WL 7751298, at *6 (B.A.P. 9th Cir. Apr. 20, 2009).

"Section 727(a)(5) is broadly drawn and gives the bankruptcy court broad power to decline

---

[2] There is some dispute between the parties as to whether I should evaluate the fourth issue (the proper look-back period) for clear error or *de novo*.  I review it under both standards and reach the same conclusion under each.

United States District Court
Northern District of California

to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re Thompson*, at *5 (quoting *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (1st Cir. B.A.P. 2005)).  The objecting party bears the initial burden of proof under § 727(a)(5) and must demonstrate three things: "(1) [the] debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets." *In re Retz*, 606 F.3d 1189, 1205 (9th Cir. 2010) (internal quotations omitted).  Once the creditor has made a prima facie case, the burden shifts to the debtor to offer credible evidence explaining the disposition of the missing assets.  *In re Thompson*, at *6.

Neither party contests the bankruptcy court's finding that Centennial successfully proved its prima facie case by showing the three elements laid out by the Ninth Circuit in *In re Retz*. However, Centennial argues that the court did err in finding that Kane satisfactorily explained that the reason he was allegedly "missing" millions in his NHL salary was gambling, living expenses, business expenses (including financing earlier debt from other creditors), and withheld income. Opening Br. 10-28.  Kane responds that the bankruptcy court was within its discretion to find that he satisfactorily explained his lost income, and that Centennial inaccurately portrayed his income and expenses.  Kane is correct.

First, Centennial argues that Kane's explanation for his loss of funds was too vague, and that the bankruptcy court committed clear error by finding otherwise.  *Id.* at 13-14, 22.  It cites *In re Stuerke*, where the bankruptcy appellate panel (BAP) reasoned that "[v]ague and indefinite explanations of losses that are based on estimates uncorroborated by documentation" are "unsatisfactory" to rebut a prima facie § 727(a)(5) claim.  61 B.R. 623, 626 (B.A.P. 9th Cir. 1986).[3]  But *In re Stuerke* is easily distinguished on the facts.  There, the bankruptcy court granted summary judgment in favor of the debtors but the BAP reversed, reasoning that while the Stuerkes' allegations might have been true—they blamed the loss of their family assets on large

---

[3] Centennial cites several other cases for the same principle; for the sake of brevity, I will address the argument through the lens of *In re Stuerke*.

United States District Court
Northern District of California

United States District Court
Northern District of California

medical bills and the inconsistent valuation methodology for a valuable piano—they were too vague for the bankruptcy court to rely on to support discharge. *Id.* This was for a very particular reason: the debtors in *In re Stuerke* did not list the amount of even one medical bill, nor did they attempt to explain how different valuation methodologies for a single piano could explain the large amount of missing assets they claimed. *Id.*

Kane justified his losses with significantly more basis than did the Stuerkes. He provided extensive testimony about his gambling habits; his numerous high-dollar loans from private individuals, casinos, and banks; the negative effect that the NHL lockout had on his salary; his business expenses; and his general inability to control his own paycheck. Judge Johnson summarized:

> The extensive documentary record and Kane's testimony in this case answers [what happened to Kane's earnings as a professional ice hockey player]. . . . [t]he evidence indisputably showed that Kane regularly borrowed staggering sums of money from a range of lenders. He used the proceeds to pay existing lenders, to cover his living expenses, and to invest in real property. He refinanced his loans almost endlessly. Sometimes, he obtained credit extensions from existing lenders—including Centennial Bank, whose loan increased from $3.9 to over $8 million over the short period of eight months. The evidence showed that near the end of this merry-go-round of borrowing, Kane was receiving little actual cash from the lenders, which he used, to pay his credit cards and living expenses. In fact, near the end, Kane stated he lost control over his paychecks. . . . Kane also had a significant gambling problem . . . The evidence also showed that Kane spent huge sums every month on his credit cards.

Order 30-31; *see also* Appellee's Responsive Brief 14 ("Responsive Br."); CB-031-032.

Kane's case differed from the debtors' in *In re Stuerke* because he provided far more explanation—which the bankruptcy court reasonably found to be credible—about why he suffered the losses that he did than did the Stuerkes.

Moreover, since *In re Stuerke* was decided, appellate courts have provided further guidance about the scope of bankruptcy courts' discretion under § 727(a)(5) that shows that the court here was well within its discretion when it determined that Kane had rebutted Centennial's prima facie showing. For example, in *In re Thompson*, the BAP cited *In re Stuerke* in affirming a bankruptcy court's approval of discharge, emphasizing how much discretion the bankruptcy courts have. *See In re Thompson*, at *5. There, the appellee's creditors argued that he failed to

United States District Court
Northern District of California

1   satisfactorily explain how he spent the proceeds of a loan after a refinancing but before his

2   Chapter 7 filing. *Id.* at **2, 6. At trial, the debtor, Thompson, appeared pro se and was the sole

3   testifying witness on his own behalf. He testified that he spent his share of the proceeds from the

4   refinancing on work on the mortgaged residence, financing the mortgage, and various bills while

5   he was unemployed. *Id.* at *2. The bankruptcy court concluded that Thompson's testimony was

6   sufficient to account for the refinancing proceeds.

7       On appeal, the creditors argued that this was clear error. *Id.* at *5. But the BAP disagreed,

8   stating that "Thompson explained in sufficient detail how he spent the proceeds, *and, more*

9   *importantly, he did so to the bankruptcy court's satisfaction*." *Id.* at *6 (emphasis added). It

10  explained that while the lower court does not have unlimited discretion for either step of a

11  § 727(a)(5) analysis, "whether a debtor satisfactorily explains a loss of assets is a question of fact

12  . . . [so t]he bankruptcy court has a great deal of discretion in determining whether an explanation

13  is satisfactory so as to defeat the objection." *Id.* at *5 (citing *Stuerke*, 61 B.R. at 626; *In re Chalik*,

14  748 F.2d 616, 619 (11th Cir. 1984)). *In re Thompson* supports the bankruptcy court here that (i) it

15  was within its discretion to find Kane's testimony about his living expenses, financing earlier

16  loans, and reduced income during the COVID-19 pandemic to be credible, and that (ii) its finding

17  is entitled to deference absent a showing of clear error. I find no clear error with how the

18  bankruptcy court assessed Kane's circumstances.

19      Centennial's second argument relies on outside-of-circuit law to argue that Kane's

20  justification for losses is too vague. Under the standard employed by bankruptcy courts in the

21  Sixth Circuit, "'[a] key focus of the 'reasonable explanation' inquiry under [§] 727(a)(5) is

22  whether the debtor's proffered explanation is capable of being verified. In other words, '. . . is the

23  explanation sufficient to enable either the trustee or a creditor to properly investigate the

24  circumstances surrounding the loss or deficiency?'" *See In re McDonald*, 614 B.R. 801 (Bankr.

25  N.D. Ohio 2020), aff'd sub nom. *In re McDonald*, 29 F.4th 817 (6th Cir. 2022); *see also In re*

26  *Ferrari*, 587 B.R. 504, 515 (Bankr. N.D. Ill. 2018); *In re Reed*, 310 B.R. 363, 369 (Bankr. N.D.

27  Ohio 2004). Centennial argues that under this standard "'[e]ven though a satisfactory explanation

28  must be convincing about the lack of concealment, the focus of the inquiry is not exclusively on

1    the subjective nature or honesty of the debtor's explanation, but is also on the objective adequacy

2    of such explanation.'" Opening Br. 29 (quoting *Vara v. McDonald*, 631 B.R. 713, 721 (N.D. Ohio

3    2021)).

4    　　　　Centennial contends that "[i]t is not enough" to overcome a § 727(a)(5) objection "that the

5    bankruptcy court found Kane to be credible." Opening Br. 29. It asserts that the court erred by

6    analyzing the missing assets category-by-category, rather than taking a broad overview of Kane's

7    financial outlook in the years leading up to his bankruptcy. *Id.* 22. It argues that such detailed

8    analysis, when combined with Kane's various explanations, shifted the burden onto Centennial to

9    sift through the evidence and find a clear error. *Id.* 22-26 (citing *Union Planters Bank, N.A. v.*

10   *Connors*, 283 F.3d 896 899 (7th Cir. 2002)).

11   　　　　The Sixth Circuit's standard is not employed by the Ninth Circuit. As Judge Johnson

12   noted, "[t]he caselaw under § 727(a)(5) does not provide a precise answer to how the court should

13   determine whether an explanation is satisfactory, [although] it seems clear that vague and

14   indefinite statements, that are otherwise unsupported . . . do not satisfy the standard." Order

15   17:17-21. The bankruptcy court was right. "What constitutes a 'satisfactory' explanation under §

16   727(a)(5) is left to this court's discretion [and] [t]he 'debtor's oral testimony may constitute

17   credible evidence explaining the disposition of assets.'" *In re Poole*, No. 19-42673 CN, 2022 WL

18   389514, at *12 (Bankr. N.D. Cal. Feb. 8, 2022) (citations omitted).

19   　　　　Kane concedes that he did not provide a paper trail definitively proving how he used each

20   asset. Responsive Br. 40. Recognizing this, the bankruptcy court's ultimate disposition for the

21   creditor's § 727(a)(5) objection turned on the credibility of Kane's testimonial explanation. As the

22   *Thompson* court noted, "findings of fact based on credibility [receive] particular deference [and]

23   [i]f two views of the evidence are possible, the trial judge's choice between them cannot be clearly

24   erroneous." *In re Thompson*, at *3 (citing Rule 8013; *Anderson*, 470 U.S. at 574) (holding that

25   "on appeal, 'due regard shall be given to the opportunity of the bankruptcy court to judge the

26   credibility of the witnesses'")). If Centennial cannot point to any clear error in bankruptcy court's

27   finding, I must defer to its finding that Kane's testimony was honest and adequate. *See In re*

28   *Bernard,* 96 F.3d 1279, 1281 (9th Cir. 1996) (reasoning that giving "great deference to the

United States District Court  
Northern District of California

8

1    bankruptcy court's findings" when "factual findings are based on determinations regarding the

2    credibility of witnesses" does not alter the burden on the objector).

3         Finally, Centennial argues that the bankruptcy court effectively "lowered the bar" for Kane

4    by allowing his habitual gambling to partially explain the lost assets.  Opening Br. 19-20.

5    Centennial misses the point when it cites to *In re Dolin* and *In re Poole*, two cases where the

6    courts denied discharge in cases involving gambling losses.  In *In re Dolin*, the Sixth Circuit

7    affirmed the lower court's finding that a debtor's "general, unsubstantiated statements" that he had

8    used the money to support his cocaine habit and gambling "'did not explain satisfactorily' the

9    disposition of more than $500,000 in the three years preceding his bankruptcy."  *In re Dolin*, 799

10   F.2d 251, 253 (6th Cir. 1986) (quoting *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.

11   1966)).  Dolin had not kept records of his exact expenditures on cocaine and gambling.  *Id.*  The

12   Sixth Circuit noted that "the mere fact that a debtor has spent money illegally does not

13   satisfactorily explain the debtor's deficiency of assets" because "neither Dolin's chemical

14   dependency nor his compulsive gambling" proved that gambling and cocaine was how he spent

15   this specific sum of missing assets.  *Id.*  And the debtor in *In re Poole*,  testified that she gambled

16   away her winnings and had a documented gambling history, but her bankruptcy schedules and

17   Statement of Financial Affairs did not disclose any corresponding gambling losses in that year.

18   *See In re Poole*, 2022 WL 389514, at *11-12.  In both cases, the debtors' testimony about

19   gambling losses was considered; it was simply not credible in light of the context of the case.  The

20   § 727(a)(5) standard is neither relaxed nor strengthened for gambling debts.  Just as with any other

21   debt, the bankruptcy court must exercise its discretion in evaluating the debtor's explanation and

22   credibility, interpreting the rules liberally for the debtor.  *See In re Bernard*, 96 F.3d at 1281

23   (citing *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985)).

24         Kane's explanation did not completely resolve all uncertainty; its adequacy under §

25   727(a)(5) turns on the credibility of his testimony in light of the bankruptcy court's category-by-

26   category analysis of assets.  The bankruptcy court might have chosen a different method of

27   accounting or alternative assessment to evaluate whether Kane's explanation of living expenses,

28   withheld income, and gambling could account for the missing assets.  It also might have deemed

United States District Court
Northern District of California

1    his testimony to be less than credible.  But when a bankruptcy court chooses one of two

2    reasonable interpretations of the evidence, I cannot reverse its decision under clear error review.

3    *See In re Marshall*, 721 F.3d at 1039.  I will not second-guess the bankruptcy court's choice to

4    follow a more detailed approach rather than the broad overview approach suggested by

5    Centennial.

6    **II.**     **SECTION 727(A)(3)**

7         Under the Bankruptcy Code, the court shall grant the debtor discharge unless:

8            the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial

9            condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the

10            case.

11    11 U.S.C. § 727(a)(3).

12       The Ninth Circuit has stated that the purpose of § 727(a)(3) is "to make discharge

13    dependent on the debtor's true presentation of his financial affairs."  *In re Caneva*, 550 F.3d 755,

14    761 (9th Cir. 2008) (internal citations omitted).  The statute does not require absolute

15    completeness in making or keeping records. *See Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir.

16    1971).  Instead, "the debtor must 'present sufficient written evidence [to] enable his creditors

17    reasonably to ascertain his present financial condition and to follow his business transactions for a

18    reasonable period in the past.'" *In re Caneva*, 550 F.3d at 761 (quoting *Rhoades*, 453 F.2d at 53).

19    This exception to dischargeability "should be strictly construed in order to serve the Bankruptcy

20    Act's purpose of giving debtors a fresh start."  *Industrie Aeronautiche v. Kasler (Matter of*

21    *Kasler)*, 611 F.2d 308, 310 (9th Cir. 1979) (internal citation omitted).

22       A creditor's prima facie case under § 727(a)(3) requires a two-prong showing: "(1) that the

23    debtor failed to maintain and preserve adequate records, and (2) that such failure makes it

24    impossible to ascertain the debtor's financial condition and material business transactions."  *In re*

25    *Cox*, 41 F.3d at 1296 (internal quotations omitted).  If the creditor successfully makes this

26    showing, "the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of

27    the records."  *In re Caneva*, at 761 (citing *In re Cox*, at 1296).  Whether a debtor has justified the

28    inadequacy of their records is a function of "whether others in like circumstances would ordinarily

10

1    keep them." *In re Caneva*, at 763.

2          The bankruptcy court found that Centennial successfully made its showing under the first

3    prong (that Kane's records were inadequate) but failed to prove the second prong (that it was

4    impossible to trace his financial situation).  I also find no clear error here.  The bankruptcy court's

5    conclusion—that Kane's lack of personal financial sophistication, reliance on financial

6    professionals, complex financial dealings, and the recordkeeping habits of typical chronic

7    gamblers—justified that his poor recordkeeping was reasonable.  Centennial also challenges the

8    bankruptcy court's chosen "look-back" period, but I find no clear error with that either.

9          **A.      Sufficiency of Records**

10          Centennial agrees with the bankruptcy court's findings that Kane did not maintain

11    adequate records but appeals its finding that Kane's limited records were nevertheless sufficient to

12    reasonably ascertain his financial picture.  Opening Br. 30-33, 36-40, 43-51.  It argues that there is

13    too little paper documentation to corroborate that Kane's assets from his salary and refinanced

14    loans are accounted for by gambling losses, financing prior loans, and withheld income.  *Id.* 36-

15    40.  Kane argues that Centennial is mistaken about the § 727(a)(3) impossibility standard: he

16    contends that "the law does not require a paper record to show where every dollar was spent" if

17    the bankruptcy court is satisfied by a thorough explanation of anything lacking paper

18    documentation.  Responsive Br. 40.

19          Chapter 7 "does not require absolute completeness in making or keeping records [so long

20    as] the debtor [] 'present[s] sufficient written evidence which will enable his creditors reasonably

21    to ascertain his present financial condition and to follow his business transactions for a reasonable

22    period in the past.'"  *In re Caneva*, at 761 (quoting *Rhoades*, 453 F.2d at 53).  Those objecting to

23    discharge "bear[] the burden of proving by a preponderance of the evidence that [the debtor's]

24    discharge should be denied."  *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163,

25    172 (9th Cir. BAP 2007), aff'd, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the

26    BAP's statement of applicable law).  "In keeping with the 'fresh start' purposes behind the

27    Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against

28    parties objecting to discharge."  *In re Bernard*, 96 F.3d at 1281. This does not alter the burden on

United States District Court
Northern District of California

the objector, but "[w]hen factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note 'variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (internal citations omitted).

Centennial has not demonstrated that the bankruptcy court clearly erred when it was unconvinced by Centennial's objection at trial. Centenniel quotes *In re Brandenfels* for the rule that it is "not enough for [the debtor] to provide records about her overall financial situation; she [] also [needed to] provide records adequate to allow creditors to trace all of her transactions." No. AP 13-03159-ELP, 2015 WL 5883317, at *6 (B.A.P. 9th Cir. Oct. 7, 2015), *aff'd*, 692 F. App'x 461 (9th Cir. 2017). But *Brandenfels* did not contradict or overrule *Caneva* with a new bright line rule. The crucial context of this isolated quote reveals that the court's reasoning affirmed *Caneva*:

> *Caneva's* mandate [is] that a debtor must "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition **and to follow his business transactions for a reasonable period in the past."** . . . It is not enough for Ms. Brandenfels to provide records about her overall financial situation; she must also provide records adequate to allow creditors to trace all of her transactions. . . . The bankruptcy court enumerated three areas in which it found Ms. Brandenfels's records to be deficient . . . We address each in turn. *Id.*, at *6–7 (quoting *In re Caneva*, 550 F.3d at 761) (emphasis in original).

*Branfendels*, at *6. Brandenfels' strong language addressed the specific circumstances of its case, but there the court made clear that "that the purpose of § 727(a)(3) is to make discharge dependent on the debtor's true presentation of his financial affairs." *Brandenfels*, at *5.

The relevant circumstances in *Brandenfels* are distinguishable from Kane's. In *Brandenfels*, the BAP identified undocumented payments for labor, mixed business and personal expenses, and ambiguous payments to third parties as deficiencies. *Id.* at *7. Because "unaccounted [labor] funds amount to 22.5 percent of [her] total contract labor costs . . . the bankruptcy court concluded that she 'was concealing the contract labor cash payments . . . under cover of a chaotic or incomplete set of records[,]' or 'doing something else with the cash.'" *Id.* Brandenfels also "[did] not attempt to explain the credit card charges of $9,500 or the cash withdrawals of $5,000" in mixed expenses, which made adequate explanation impossible. *Id.* at

United States District Court
Northern District of California

*8.  Finally, Brandenfels "utterly failed at trial to provide any written records explaining" her payments to third parties that were made with company money for non-business expenses, such as $2,500 of company funds to an "unidentified neighbor."  *Id.*  In contrast, Centennial has not argued on appeal that the bankruptcy court failed to note clearly wrongful conduct of similar nature,[4] nor are there holes in Kane's paper record that he did not attempt to explain.  Rather, Centennial contests the adequacy of his explanations.  The issue of adequacy is well within the scope of the bankruptcy court's determination of Kane's credibility.

Centennial again cites *In re Poole*, where the court considered the types of documentation that the debtor provided when it denied her discharge under the § 727(a)(3).  Reply Br. 12-13 (citing *In re Poole*, 2022 WL 389514, at *10).  Poole submitted credit union account statements for the relevant years, listing numerous cash withdrawals from ATMs in or near casinos; W-2G and 1099 Misc. Statements from Poole's three favorite casinos, and her federal tax returns for several years.  *In re Poole*, at *10.  The bankruptcy court there found that these records did not sufficiently account for Poole's gambling expenses at the casinos because they "only partially detailed" Poole's wins and losses, her tax returns inaccurately reported her gambling income and deductions, and Poole's bank accounts did not reflect the "substantial funds" that flowed through her hands while gambling without being deposited.  *Id.*, at *11.

The inadequacy of Poole's documents was far more serious in context than Kane's.  In *In re Poole*, the court analyzed the deficiency of each of the records in conjunction with each other: the limited picture provided by the casino records, tax returns that inaccurately reported her gambling income and deductions, and bank accounts that did not accurately account reflect the flow of gambling cash.  *Id.*  Between missing documents and contradictions between those she did provide, the court concluded that Poole's records "[did] not come close to capturing [her] gambling over the relevant years," making it "impossible to ascertain Poole's present financial condition."  *Id.* at *10.

In contrast, Kane provided documentation that the bankruptcy court, in its reasonable

---

[4] Centennial had previously argued that Kane's discharge should be denied under § 727(a)(4) for making false statements but drops this argument on appeal.

1    judgment, deemed adequate to indicate that he used his loan proceeds to repay 26 prior loans from

2    institutional lenders. Responsive Br. 37. The bankruptcy court also noted that Kane's Chapter 7

3    trustee testified that Kane provided all of the documents and information about them that he

4    requested, and that he was satisfied with Kane's answers to questions about his various bank

5    accounts. *Id.* at 38. Thus, the court's impossibility analysis needed only focus only on Kane's

6    earnings as a professional hockey player. Order 17-27.

7          In this regard, the bankruptcy court noted that Centennial's estimate of $5.25 million to $8

8    million in *gross* earnings as a professional hockey player ignored that this was substantially

9    reduced by taxes and business expenses. *Id.* at 18-20. Finally, Kane also provided his federal and

10    state tax returns, and there is no allegation that he falsified either. *Id.* This stands in sharp contrast

11    to Poole, whom the court found had "knowingly and fraudulently" made misstatements to her

12    creditors "given the extent of her mistaken entries, in particular those relating to her gambling

13    income." *In re Poole*, 2022 WL 389514, at *12.

14          The Ninth Circuit is clear that the purpose of § 727(a)(3) is to make discharge dependent

15    on the debtor's true presentation of his financial affairs. *In re Caneva*, 550 F.3d at 761 (citing

16    *Cox*, 41 F.3d at 1296). Without adequate records, the debtor must provide adequate explanations.

17    *In re Fader*, 414 B.R. 640, 645 (Bankr. N.D. Cal. 2009). I find no clear error in the bankruptcy

18    court's finding that Kane's explanations were adequate.

19         **B.**       **Justification for Not Keeping Adequate Records**

20          Although I already found no clear error in the bankruptcy court's ruling that Centennial did

21    not meet its prima facie burden, and so Kane need not make a defense, I will briefly address the

22    bankruptcy court's finding that he was also justified in not keeping and maintaining adequate

23    records. Centennial argues that because the Bankruptcy Code puts the affirmative obligation on

24    the debtor to keep adequate financial records, Kane was not justified in failing to provide

25    documentation of at least his gambling wins and losses. Opening Br. 40-43. It also challenges the

26    bankruptcy court's reasons that Kane was justified in keeping inadequate records. The bankruptcy

27    court cited Kane's lack of personal financial sophistication, his reliance on professionals for

28    financial advice, and that his financial dealings were unduly complex. In addition, Judge Johnson

United States District Court
Northern District of California

14

reasoned that most chronic gamblers do not keep detailed records.  Order 31-37.

If the creditor successfully pleads a prima facie claim under § 727(a)(3), then the debtor may plead that "such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3).  The following non-exclusive factors guide bankruptcy courts' consideration of whether inadequate records are justified: "debtor's education, the sophistication of the debtor's business experience, the size and complexity of debtor's business, debtor's personal financial structure, and any special circumstances." *In re Nevett*, No. AP 18-90038-CL, 2021 WL 2769799, at *10 (B.A.P. 9th Cir. July 1, 2021); *In re Cox*, 41 F.3d at 1299.

Regarding financial sophistication, the bankruptcy court noted that Kane had no higher education and no financial literacy education.  Order 32.  In response to Centennial's trial argument that Kane was a highly compensated salaried employee with experience from 26 loans, the court reasonably observed that this "does not compel a conclusion of sophistication . . . the totality of evidence shows he 'was not sophisticated in finance matters.'" *Id.* at 32.  On appeal, Centennial counters that Kane never testified that his lack of college education contributed to an inability to keep adequate financial records, and that Kane's records are inadequate even for someone with a modest education.  Opening Br. 43-44.  But it was not necessary for Kane to specifically testify that his education level was the cause of his lack of sophistication.  The bankruptcy court's inference stands because it was "logical, plausible, and supported by the evidence." *In re Nevett*, at *7, *10-*11.

The bankruptcy court likewise noted that Kane's job was to play professional ice hockey, not to manage the complex finances of someone with his salary and investments.  Order 32.  Kane had relied on agents, business advisors, and certified accountants since the age of 15, so "it is hardly surprising that Kane did not keep better records: he paid other people to do that." *Id.* at 32-33.  The bankruptcy court analogized to *In re Brenes*, where a physician with a complex medical practice and associated business was found to be justified in reasonably delegating to and relying upon business managers, accountants, and attorney for recordkeeping. *Id.* (citing *In re Brenes*, 261 B.R. 322 (Bankr. D. Conn. 2001)).  Centennial counters that in *In re Brenes*, these records were eventually produced, unlike in Kane's case.  Opening Br. 44-45.  This argument conflates the

1    objector's prima facie argument with the debtor's justification defense.  At this stage, the question

2    is whether a reasonable person in Kane's situation would keep the same quality and quantity of

3    records.  The bankruptcy court's justification analysis correctly considered the documents that

4    Kane did actually produce before separately considering those that he did not.

5         The bankruptcy court provided an overview of the complexity of Kane's finances as a

6    professional hockey player servicing more than two dozen institutional loans, taking yet more

7    loans from individuals, and placing bets with bookies.  Order 33-34.  It also noted that some of

8    Kane's bank statements were missing because he had closed those accounts.  *Id.*  Centennial cites

9    *In re Steffensen* for the rule that such complexity requires a higher level of record keeping, not

10   less.  Opening Br. 45 (citing *In re Steffensen*, 534 B.R. 180, 198 (Bankr. D. Utah 2015), aff'd, 567

11   B.R. 188 (D. Utah 2016)).  A fuller reading of the passage shows that the *In re Steffensen* court

12   was not suggesting that this consideration should automatically override a debtor's abilities for

13   sophisticated financial recordkeeping:

14                Lastly, a debtor must keep and preserve records commensurate with
             the complexity of his financial condition. *The law does not expect an*
15           *unsophisticated wage earner's records to be as thorough as those of*
             *a large corporation.* "In general, a higher standard of recordkeeping
16           will be required, as a prerequisite to discharge, of Chapter 7 debtors
             who are sophisticated business persons."  "When a debtor is engaged
17           in business, he has a duty to maintain records in a manner consistent
             with what is normally expected of businesses of the same
18           complexity."

     *In re Steffensen*, 534 B.R. at 197 (citations omitted) (emphasis added).

19        In other words, the complexity factor increases or decreases the reasonableness of the

20   debtor's inadequate records depending on the debtor's actual ability to provide commensurately

21   sophisticated financial records.  Thus, the bankruptcy court did not clearly err in finding that

22   Kane's complex business matters justified him to keep records only as thoroughly as he was able.

23        Regarding the effect that Kane's gambling had on his obligation to produce records, the

24   bankruptcy court considered four cases to evaluate whether Kane's habitual gambling supports his

25   justification in keeping inadequate records.  Order 35-36.  At trial, Centennial cited *In re Poole*

26   and *In re Hong Ming Tran*, 464 B.R. 885, 892 (Bankr. S.D. Cal. 2012), both cases where the

27   debtors' documentation did not account for the gambling losses they claimed.  Order 49-50.  But

28   the bankruptcy court reasonably distinguished both cases: unlike in *In re Poole* and *In re Hong*

*Ming Tran*, Kane produced "ample evidence" of his significant gambling losses and high interest loans. *Id.* at 35-36. Moreover, in *In re Poole*, the court reiterated that when the debtor is a habitual gambler, the key question for a § 727(a)(3) justification is unchanged: whether "a reasonable person" in their situation "would have made a better effort to document their wins [] and, perhaps more importantly, their losses [] … [with] better and more accurate records." *In re Poole*, at *11-12.

The court also distinguished *In re Chen*, another case to which Centennial analogized; there, a gambler failed to keep records not from lack of ability like Kane, but because it was "too depressing." Order 50 (quoting *In re Chen*, No. AP 16-01166-TWD, 2017 WL 4768104 (B.A.P. 9th Cir. Oct. 17, 2017)). Judge Johnson instead chose to analogize Kane's situation to that of the debtor in *In re Hirsh*, where the debtor was a chronic gambler without sophisticated financial education. Order 50 (citing 36 B.R. 643, 645-46 (Bankr. S.D. Fla. 1984)). The court found that Kane's, like Hirsh's, "lack of organization and [] ineptitude in the accounting is due to incompetence rather than deviousness." Order 50 (citing *In re Hirsh*, 36 B.R. at 46). This is another point where the court's findings turn on its evaluation of Kane's credibility and honesty; I do not question it in the absence of some clearly erroneous reasoning.

Finally, despite Centennial's suggestion otherwise, the bankruptcy court's decision in no way relied upon a holding or understanding that Kane's gambling problem "lowered the bar" for what a debtor must show to merit bankruptcy discharge. *See* Opening Br. 15. The court carefully considered the relevant factors and applied extensive case law to its consideration. While Kane is not required to show that his inadequate records were justified—because Judge Johnson reasonably determined that Centennial did not make its prima facie showing under § 727(a)(3)—I am left with no definite and firm conviction that the bankruptcy judge was mistaken in finding Kane's inadequate records were justified. I find no clear error.

### C.    Look-Back Period

Centennial and Kane dispute the standard of review to consider how far prior to Kane's Chapter 7 petition the bankruptcy court should have looked. *Compare* Opening Br. 34-36 *with* Responsive Br. 33-36. The parties agree that this issue raises the question of how a court should

1    apply a legal standard to a set of facts, and that "[m]ixed questions of law and fact are [generally]

2    reviewed de novo." *In re Chang*, 163 F.3d at 1140. Kane points out that the Supreme Court

3    recently clarified that when the question is primarily factual, the standard of review is "usually"

4    clear error review. *U.S. Bank N.A. v. The Village at Lakeridge, LLC*, 583 U.S. 387, 388 (2018).

5    Centennial does not respond to this argument. *See* Reply Br. 19-20. Because this mixed question

6    involves the lower court making "case-specific factual issues [such as] marshal[ing] and

7    weigh[ing] evidence, [and] mak[ing] credibility judgments" rather than "expound[ing] on the

8    law," *Lakeridge* requires me to review this question under clear error review. *Lakeridge*, 583 U.S.

9    at 395-96; *see e.g.*, *In re Nevett*, at *7, *10-*11 (holding that the lower court's inference should

10   stand if it was "logical, plausible, and supported by the evidence").[5] But even if I reviewed this *de*

11   *novo*, I would reach the same conclusion.

12        Centennial is correct that § 727(a)(3) does not limit the court's inquiry to any specific

13   period leading up to the debtor's petition. *See In re Nevett*, at *10; *In re Racer*, 580 B.R. 45, 55

14   (Bankr. E.D.N.Y. 2018).[6] But the conclusions it draws from this rule miss the mark. Centennial's

15   position is that Kane inadequately explained the loss of $11,000,000 in loans from Institutional

16   Lenders as refinancing prior loans and that the bankruptcy court wrongly determined that the rest

17   was lost to Kane's habitual gambling. It contends that as a result, the "look-back" period should

18   have extended beyond September 2018, so as to ensure Kane's "affirmative duty" for "complete

19   disclosure." Opening Br. 36-40 (citing *In re Caneva*, 550 F.3d at 762) (holding that "[c]omplete

20

21   _____

     [5] For mixed questions, the standard of review depends on "whether answering it entails primarily
22   legal or factual work." *Lakeridge*, 583 U.S. at 395-96 (holding that "[m]ixed questions are not all
     alike . . . some require courts to expound on the law, particularly by amplifying or elaborating on a
23   broad legal standard. When that is so—when applying the law involves developing auxiliary legal
     principles of use in other cases—appellate courts should typically review a decision de novo. But
24   . . . other mixed questions immerse courts in case-specific factual issues—compelling them to
     marshal and weigh evidence, make credibility judgments, and otherwise address what we have
25   (emphatically if a tad redundantly) called 'multifarious, fleeting, special, narrow facts that utterly
     resist generalization.' And when that is so, appellate courts should usually review a decision with
26   deference. *In short, the standard of review for a mixed question all depends—on whether
     answering it entails primarily legal or factual work*") (citations omitted) (emphasis added).

27   [6] This omission in the Bankruptcy code's language stands in direct contrast with the language in
     §§ 727(a)(2), (a)(7), (a)(8), (a)(9), and (a)(11) directly adjacent to where Congress did choose to
28   include explicit look-back periods.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    disclosure is in every case a condition precedent to the granting of the discharge" and "§ 727(a)(3)

2    'places an affirmative duty on the debtor to create books and records accurately documenting his

3    business affairs'")); Order 27.

4            Centennial raises the look-back period issue to argue that the bankruptcy court's chosen

5    period of review prevented it from accurately assessing whether Kane's records were adequate.

6    However, "adequacy" requires only records "*reasonably* [adequate for his creditors to] ascertain

7    his present financial condition and to follow his business transactions *for a reasonable period in*

8    *the past*."  *In re Caneva*, 550 F.3d at 761 (quoting *Rhoades,* 453 F.2d at 53) (emphasis added).

9    Because, as the bankruptcy court noted, "[d]ebtors are required to keep records for a 'reasonable'

10   period of time for § 727(a)(3) purposes, and a court's determination of 'reasonableness' depends

11   on the particular facts and circumstances of each case," the court had wide discretion to determine

12   on a fact-specific basis which timeframe to examine.  Order 27:25-28:3; Resp. at 34 (quoting *In re*

13   *Sfadia*, No. ADV. 03-01404-GM, 2007 WL 7540987, at *11 (B.A.P. 9th Cir. Sept. 5, 2007)).

14           The same factors that a court uses to determine the justification issue "should also inform

15   the court's decision regarding how far back it is reasonable to expect a debtor to keep records

16   regarding his financial transactions."  *In re Nevett*, 2021 WL 2769799, at *10.[7]  To reiterate, these

17   factors include the "debtor's education, the sophistication of the debtor's business experience, the

18   size and complexity of debtor's business, debtor's personal financial structure, and any special

19   circumstances."  *Id.*  Given these factors, the existence of "lost assets of substantial value relative

20   to the debtor's liabilities" *may* warrant the extension of the look-back period—but it is for a

21   bankruptcy court to review the evidence and determine what scope is necessary for a reasonable

22   understanding of a reasonable period in the past.  *In re Racer*, 580 B.R. at 55 (quoting *In re Stiff*,

23   512 B.R. 893, 898 (Bankr. E.D. Ky. 2014)); *In re Caneva*, 550 F.3d at 761.  Under these

24

25   [7] *See also Id.* at *10 n. 6 (citing *Snyder v. Dykes (In re Dykes)*, 590 B.R. 904, 912-13 (8th Cir.
     BAP 2018); *DeWine v. Scott (In re Scott)*, 566 B.R. 471 (Bankr. N.D. Ohio 2017); *Menotte v.*

26   *Hahn (In re Hahn)*, 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007), *Structured Asset Servs. V. Self (In*
     *re Self)*, 325 B.R. 224, 241–42 (Bankr. N.D. Ill. 2005); *Losinski v. Losinski (In re Losinski)*, 80

27   B.R. 464, 474 (Bankr. D. Minn. 1987); *Sfadia v. Dongkuk Int'l, Inc. (In re Sfadia)*, BAP No. CC–
     06–1176–MaBPa, 2007 WL 7540987, at *11 (9th Cir. BAP Sept. 5, 2007)) (finding that almost all

28   held that a court's determination of "reasonableness" depends on the particular facts and
     circumstances of each case").

1   circumstances, I find no clear error in the bankruptcy court's determination that looking back only

2   to the time of Centennial's first loan to Kane was sufficient for his creditors to reasonably

3   understand his financial condition and follow his business transactions for a reasonable period in

4   the past.

5         Both parties primarily rely on *In re Nevett*, where debtor Nevett appealed the bankruptcy

6   court's § 727(a)(3) ruling, arguing that using a six-year "look-back" for his duty to keep records

7   was a clear error.  *See In re Nevett*, 2021 WL 2769799 (B.A.P. 9th Cir. Jul. 1, 2021), at *1.  There,

8   the bankruptcy court denied Nevett's discharge because his business expertise suggested that he

9   should have kept better records, the large amount that was lent to him even in the years just prior

10  to his bankruptcy petition was far greater than his scarce funds when he filed, and he testified

11  inconsistently about how he used the loan proceeds.  *Id.*  Nevett argued that two of loans were old

12  enough that his failure to keep adequate records of how he used the proceeds was justified, but the

13  bankruptcy court deemed that this would force it to speculate about what happened to the full

14  amount of the loan proceeds.  *Id.*  The BAP found no clear error in the lower court's choice of

15  timeframe.  *Id.*  Kane acknowledges that the debtor's discharge was ultimately denied, but focuses

16  on the BAP affirming that Nevett was justified in not keeping records for one of his loans that

17  began five years before the bankruptcy petition and had been mostly repaid.  *See* Responsive Br.

18  35 (citing *In re Nevett*, at *12-13).  Centennial, in contrast, focuses on how the BAP affirmed the

19  denial of Chapter 7 bankruptcy because the bankruptcy court made no error in finding Nevett was

20  not justified in failing to keep records of how he spent the proceeds of his six-year-old loans.  *See*

21  Reply Br. 19-20 (citing *In re Nevett*, at *9).

22        The *In re Nevett* court applied the non-exclusive factor analysis to the two primary loan

23  transactions.  Regarding the debtor's education, sophistication of business experience, and

24  business size and complexity, the court considered that Nevett's large loan size, business dealings

25  at the time, career of managing millions of dollars in loans and investment funds, the types of

26  records he typically kept, and bachelor's degree in real estate finance all undermined the notion he

27  was justified in not keeping adequate records.  *In re Nevett*, at *11.  Regarding other special

28  circumstances, the court considered how Nevett's trial testimony contradicted his earlier testimony

United States District Court
Northern District of California

20

on how he used the loan proceeds and the size of the missing assets after borrowing millions of dollars in the years leading up to his bankruptcy filing. *Id.* To be clear, on appeal, the BAP did not say that the bankruptcy court must have ruled one way or another—it merely said that the bankruptcy court's "inference was logical, plausible, and supported by the evidence. . . . [and] the court's choice between two reasonable views of the evidence is not clearly erroneous." *Id.* (citing *Anderson*, 470 U.S. at 574).

Like the court in *In re Nevett,* while sitting on appeal I must focus only on whether the bankruptcy court's inference that it would be sufficient to limit the "look-back" period to the time following Centennial's first loan to Kane was "logical, plausible, and supported by the evidence" and meaningfully assessed the justification factors. *Id.* Based on the bankruptcy court's detailed analysis of each of Kane's asset types and discussion of what "look-back" period would be reasonable, I find no clear error. Order 2-8, 27-28. First, the court conducted a full analysis of the justification factors, as I discussed previously. Because Centennial can point to no clear error that the court made in finding that Kane was justified based on evidence from September 2018 forward, I see no clear error that required it to expand its scope further into the past.

Moreover, the court reasonably inferred that Centennial would not have underwritten its initial $3.9 million loan unless it was "satisfied" after a review of his "financial statement, bank records, and other data to determine whether the loan [met Centennial's] prudential lending standards." *Id.* at 28. This review would have included prior loans from other creditors, none of whom raised any § 727(a)(5) objection. The bankruptcy court further noted that extending the look-back period to this period that Centennial had already examined would create the wrong incentives. *See* Order 28 n. 13. Such an interpretation would allow "a lender [to] lend money to a debtor who was not creditworthy and maintained poor records . . . [then] deny a discharge based on that same poor recordkeeping. But § 727(a)(3)'s rule that debtors should keep records was not meant to substitute for good underwriting practices by lenders." *Id.* Centennial did not dispute that it reviewed Kane's financial records prior to its initial loan, nor that it was satisfied following this review. *See generally* Opening Br. Instead, it argues that the bankruptcy court failed to identify a prior case in which the "look-back" period was determined by initial loan date of the

1    only creditor to raise a § 727(a)(3) objection.  *See id.* at 35.  Likewise, it challenges the bankruptcy

2    court's concern regarding improper incentives on the grounds that the "creditor's behavior is [not]

3    a condition for the debtor's obligation.  Centennial was not on trial, Kane was."  *Id.* at 36.

4          Centennial misunderstands both the justification factors and the Bankruptcy Code's

5    purpose.  The sixth factor of "special circumstances" would be meaningless if it always required

6    identical cases for consideration.  Instead, prior precedent suggests that the bankruptcy court must

7    conduct case-specific analysis of "special, narrow facts that utterly resist generalization."

8    *Lakeridge*, 583 U.S. at 395-96.  It did just that in this case. The court's inference was "logical,

9    plausible, and supported by the evidence [even if Centennial] views the evidence differently and

10   would instead infer" the opposite conclusion.  *See In re Nevett*, at *11.  Moreover, the Ninth

11   Circuit has made clear that the Bankruptcy Code's purpose is to generally enable the debtor's

12   "'fresh start'"—regardless of if they are habitual gamblers—so "courts should construe § 727

13   liberally in favor of debtors and strictly against parties objecting to discharge."  *Compare* Opening

14   Br. 36 *with In re Bernard*, 96 F.3 at 1281.  The bankruptcy court's opinion that Centennial's

15   reading would allow creditors to ensure debtors that it knew kept poor records could never have a

16   "fresh start" draws directly from this purpose.  *See* Order 28 n. 13.  Given the bankruptcy court's

17   thoughtful analysis of the justification factors in light of the purposes of the Bankruptcy Code, I

18   can find no clear error in its decision regarding the look-back period.

19         As I found earlier, clear error analysis is appropriate in this case.  However, for

20   completeness, if I reviewed this question *de novo*, I would arrive at the same conclusion as the

21   bankruptcy court.  At trial, Centennial Bank requested a look-back period longer than the fixed

22   two-year period that the bankruptcy court decided on, which started in September 2018.  It

23   requested "twelve to seven" years of documents.  Order 27.  The law is clear that what constitutes

24   a reasonable look-back period must be determined on a case-by-case basis.  *See In re Nevett*, at

25   *10, n. 6.  Numerous cases have confirmed this principle.  *See e.g. Snyder v. Dykes (In re Dykes)*,

26   590 B.R. 904, 912-13 (8th Cir. BAP 2018); *DeWine v. Scott (In re Scott)*, 566 B.R. 471 (Bankr.

27   N.D. Ohio 2017); *Menotte v. Hahn (In re Hahn)*, 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007);

28   *Structured Asset Servs. v. Self (In re Self)*, 325 B.R. 224, 241–42 (Bankr. N.D. Ill. 2005)*; Losinski*

United States District Court
Northern District of California

1  *v. Losinski (In re Losinski)*, 80 B.R. 464, 474 (Bankr. D. Minn. 1987).  In a rare instance of

2  endorsing a particular look-back period, the court in *In re Self* noted that, while § 727(a)(3) does

3  not specify a time period for which a debtor is required to account for his pre-petition financial

4  condition, "several courts . . . have limited the inquiry to a period of two years prior to the

5  commencement of the case." *In re Self*, 325 B.R. at 241 (collecting cases).

6      Centennial approved its first $3.9 million loan to Kane in September 2018, after

7  conducting its own independent review of Kane's financial situation to its satisfaction.  Order at

8  28.  Centennial presumably would not have approved Kane for that loan were his financial records

9  inadequate to account for his transactions in the years preceding September 2018.  It would

10  therefore seem redundant and a waste of court resources to examine the adequacy of Kane's

11  records prior to September 2018, and that is as far as I would have looked.

12      I also agree with the bankruptcy court's reasoning that starting the look-back period prior

13  to that date would create perverse incentives for lenders.  If I were to look-back past September 5,

14  2018, and find Kane's records before that date were unjustifiably inadequate, that would give the

15  green light to banks to lend to uncreditworthy debtors based on sloppy due diligence and then rely

16  on the backstop of bankruptcy to bail them out if the loan turned bad.  Reviewing the

17  circumstances of Kane's case *de novo*, I also find that restricting the look-back period to two years

18  prior to Kane's petition was reasonable.

19                            **CONCLUSION**

20      The bankruptcy court did not clearly err in denying Centennial's objection to Kane's

21  discharge under §§ 727(a)(3) and (a)(5).  The bankruptcy court's decision is AFFIRMED.

22      **IT IS SO ORDERED.**

23  Dated: March 29, 2024

24

25

26  William H. Orrick
    United States District Judge

27

28

United States District Court
Northern District of California